STATE of Oklahoma, Plaintiff in Error,

v.

Don Ralph CLINE et al., Defendant in Error.

No. A–12533.

Criminal Court of Appeals of Oklahoma.

Feb. 19, 1958.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., Warren H. Crane, County Atty., David J. Aubrey, Asst. County Atty., Lawton, for plaintiff in error.

John W. Tyree, Lawton, for defendant in error.

BRETT, Presiding Judge.

This is an appeal by the State of Oklahoma on a reserved question of law from the County Court of Comanche County, Oklahoma. The question arises out of the filing of an information in said County Court against several defendants among whom is Don Ralph Cline, defendant here-

in, he having obtained a severance. The said information charged Cline and his co-defendants with disturbing the peace and quiet of a group of Girl Scouts and their leaders and others assembled at Camp Boulder, located within the Wichita Mountain Wildlife Refuge, by using profane, obscene, abusive, insulting, and vulgar language in the presence of the said Girl Scouts and their leaders, said language in its common acceptance being designed to arouse the anger of said persons to whom it was directed and provoke a breach of the peace, all of which acts grossly outraged public decency contrary to law.

To the information, defendant Cline demurred, attacking the jurisdiction of the County Court on the theory that the said Wichita Mountain Wildlife Refuge was set aside by Presidential Proclamation June 2, 1905, 34 Stat. 3062, as such refuge and ever since said date had been subject to the administrative control of the government of the United States, and the State of Oklahoma is without jurisdiction to prosecute alleged offenses committed against state law thereon. After a hearing, the County Court, in substance, made the following finding of facts: 1. The alleged offense, if any was committed, occurred at or near what is known as Camp Boulder, located in the Wichita Mountain Wildlife Refuge, and Camp Boulder is not near the headquarters of the Wichita Wildlife Refuge, and no administrative buildings are located near Camp Boulder; 2. The Wichita Wildlife Refuge is located within the boundaries of Comanche County, Oklahoma; 3. The Wichita Mountains Wildlife Refuge was set aside as a game refuge by Presidential Proclamation dated June 2, 1905; 4. As a practical fact, since statehood, the Federal Government has exercised administrative control over all of the area embraced in the Wichita Mountains Wildlife Refuge; 5. No part of the territory embraced in the Wichita Mountains Wildlife Refuge has ever been patented to or owned by any individual citizen; and, 6. No part of the territory has ever been upon the tax rolls of Comanche County, Oklahoma. On these findings the County Court held it was without jurisdiction to try the case, finding exclusive jurisdiction was in the United States. Further proceeding in said action was stayed, pending an appeal on the state's reserved question to this Court.

The question simply stated is whether the State of Oklahoma or the Federal Government has jurisdiction of an offense against state law committed within the confines of the Wichita Mountains Wildlife Refuge which is located within the boundaries of Comanche County, Oklahoma.

The President was empowered to create forest reserves under the provisions of Sec. 24, 26 Stat. at L. 1103, 16 U.S.C.A. § 471. This Act reads, in part, as follows:

"The President of the United States may, from time to time, set apart and reserve, in any State or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as national forests, and the President shall, by public proclamation, declare the establishment of such forests and the limits thereof."

Under the authority of the foregoing Act, President McKinley, by Executive Proclamation issued July 4, 1901, established the Wichita Forest Reserve. 32 Stat. at. L. 1973. Within the area described therein was Camp Boulder, the scene of the alleged offense. At all times since, it has been part of the area here in question. Thereafter, President T. Roosevelt set aside the Wichita Forest Reserve as a game reserve by Executive Proclamation June 2, 1905. This was done under authority of 16 U.S.C.A. § 684 reading as follows:

"The President of the United States is hereby authorized to designate such areas in the Wichita National Forest * * * as should, in his opinion, be set aside for the protection of game animals and birds and be recognized as a breeding place therefor."

Under authority of 16 U.S.C.A. § 473, 30 Stat. at L. 34, 36, he might have revoked and vacated the Executive Proclamation establishing the area in question as a forest reserve, but this he did not do, hence, the area continued as both a national forest and game reserve. Thereafter, on May 29, 1906, President Roosevelt enlarged the area by Executive Proclamation. 34 Stat. at L. 3207.

Such was the status of the area on November 16, 1907, when Oklahoma became a state. Other Presidential Proclamations were issued subsequent to the foregoing ones, none of which are important herein, except the one of November 27, 1936, 50 Stat. 1797, whereby the Wichita Forest Reserve ceased to be a national forest and became exclusively a game reserve.

The land here in question was acquired by the United States in 1803 by purchase from France, 8 Stat. 200. Until the State of Oklahoma was admitted into the Union, the United States had sovereignty and political dominion over the same. By Presidential Proclamations hereinbefore set out, up to the time of the admission of Oklahoma into the Union control of the United States Government over the Wichita Mountains Wildlife Refuge was paramount. Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264. When Oklahoma became a state, the United States might have retained by express reservation exclusive jurisdiction thereof. Fort Leavenworth R. Co. v. Lowe, supra.

Art. 1, Sec. 8, Cl. 17 of the Constitution of the United States provides:

"The Congress shall have power * * * to exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; * * *."

Art. IV, Sec. 3, Cl. 2 of the United States Constitution reads:

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State."

■ Exclusive Federal jurisdiction over land within the boundary of a state may be obtained by one of the following methods: (1) By excepting the place from the jurisdiction of the state upon the admission of the state into the Union. (2) By cession from the state to the Federal Government. (3) Pursuant to Art. 1, Sec. 8, Cl. 17, supra, of the Federal Constitution by a Federal acquisition of land with state consent. In the absence of the acquisition of jurisdiction over lands, located within a state in one of these methods, the rights of the United States Government are proprietary. Fort Leavenworth R. Co. v. Lowe, supra; Olsen v. McPartlin, D.C., 105 F. Supp. 561.

■ Clause 7 of the Enabling Act by which Oklahoma became a state reads in part as follows:

" * * * nothing in this Act contained shall repeal or affect any Act of Congress relating to the Sulphur Springs Reservation as now defined or as may be hereafter defined or extended, or the power of the United States over it or any other lands embraced in the State hereafter set aside by Congress as a national park, game preserve * * * or other reservation, or in the said Sulphur Springs Reservation, as it now is or may be hereafter defined or extended by law; but exclusive legislation in all cases whatsoever, shall be exercised by the United States which shall have exclusive control and jurisdiction over the

same: But nothing in this proviso contained shall be construed to prevent the service within said Sulphur Springs Reservation or national parks, game preserves, and other reservations hereafter established by law of civil and criminal processes lawfully issued by the authority of said State, \* \* \*."

It is a well-established rule of construction that statutes whereby a state relinquishes jurisdiction over lands to the Federal Government are to be strictly construed, and it will not be presumed, in the absence of a clearly expressed intent, that the state has relinquished its control of said lands. 91 C.J.S. United States § 7, note 59, p. 21. The rights of a state will not be taken away by implication.

> "The acquisition by the United States of title to lands within the boundaries of a state is not sufficient to exclude the state from exercising any legislative authority, including its taxing and *police power*, in relation to the property and activities of individuals and corporations within the territory, but it must appear that the state, by consent of cession, has transferred to the United States that residuum of jurisdiction which otherwise it would be free to exercise." (Emphasis ours.) Ryan v. State, 188 Wash. 115, 61 P.2d 1276, affirmed 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187; Valley County v. Thomas, 109 Mont. 345, 97 P.2d 345; People v. Godfrey, 17 Johns, N.Y., 225, 232; 91 C.J.S. United States § 7, note 33, p. 18.

It is clear from a reading of the foregoing Section 7 of the Oklahoma Enabling Act that there was no express reservation therein to the Wichita National Forest and Game Preserve, as it then was designated, by which the United States reserved exclusive jurisdiction thereof. The only express reservation relates to Sulphur Springs Reservation, now Platt National Park, or any other lands embodied in the state thereafter set aside as a game preserve. There was no specific reserva-

tion of jurisdiction of any game preserve then in existence, Underhill v. State, 31 Okl.Cr. 149, 237 P. 628, 629, notwithstanding to the contrary. That opinion completely overlooked the words "hereafter set aside by Congress". It is apparent that while that decision was correct as to Sulphur Springs Reservation, its language as to any then existing game reserves was pure dicta, and we so hold. As was said in Rogers v. Squier, 9 Cir., 157 F.2d 948, 949, certiorari denied 330 U.S. 840, 67 S.Ct. 977, 91 L.Ed. 1287, rehearing denied 331 U.S. 866, 67 S.Ct. 1346, 91 L.Ed. 1870:

> "The enabling act contained no provision retaining jurisdiction in the United States over this reservation. Accordingly federal jurisdiction exists only if it has been ceded by the state."

It clearly appears there was no express reservation or acquisition by the Federal Government or cession of jurisdiction by Oklahoma of this area. Hence, the Federal Government is not clothed with exclusive jurisdiction in the Wichita Mountains Wildlife Refuge. It is a fundamental principle of construction that to include one thing in a description and not another is to exclude the latter. 82 C.J.S. Statutes § 333, p. 667. On the basis of the Enabling Act, we are compelled to conclude the Wichita Mountains Wildlife Refuge not being mentioned and being then in existence was excluded from the area over which the United States Government was given exclusive jurisdiction. We know of no later Act of cession or consent after Oklahoma's admission which would change the situation.

■ The provisions of 80 O.S.1951 §§ 1 and 2 and Art. I, Sec. 8, Cl. 17 of the United States Constitution apply only to lands acquired with the consent of the state for forts, magazines, arsenals, dockyards, and other needful buildings. We have been unable to find any case which construes game reserves as coming within the foregoing description. To the contrary, Collins v. Yosemite Park & Curry Co., 304 U.S. 518, 58 S.Ct. 1009, 1014, 82 L.Ed. 1502 holds:

"The United States has large bodies of public lands. These properties are used for forests, parks, ranges, wild life sanctuaries, flood control and other purposes which are not covered by Clause 17."

Other Oklahoma Statutes relating to jurisdiction over lands not ceded to but otherwise acquired by the United States are 80 O.S.1951 §§ 6 and 7 which read as follows:

"The consent of the State of Oklahoma be and is hereby given to the acquisition by the United States by purchase, gift or condemnation with adequate compensation, of such lands in Oklahoma, as in the opinion of the Federal Government may be needed for the establishment, consolidation and extension of National Forests in the State; provided, that the State of Oklahoma shall retain a concurrent jurisdiction with the United States in and over the lands so acquired, so far that civil process in all cases, and *such criminal process as may issue under the authority of the State of Oklahoma against any person charged with the commission of any crime without or within said jurisdiction,* may be executed thereon in like manner as if this Act had not been passed." (Emphasis supplied.)

"Power is hereby conferred upon Congress of the United States to pass such laws and to make or provide for the making of such rules and regulations of both a civil and criminal nature, and provide punishment therefor, as in its judgment may be necessary for the *administration, control and protection* of such lands as may be from time to time acquired by the United States under the provisions of this Act." (Emphasis supplied.)

In construing these statutory provisions, it is necessary to determine whether the United States can acquire less than exclusive jurisdiction over land acquired other than as contemplated by the provisions of Art. I, Sec. 8, Cl. 17 of the Federal Constitution. 16 U.S.C.A. § 480, as follows, so provides:

"The jurisdiction, *both civil and criminal, over persons within national forests shall not be affected or changed* by reason of their existence, except so far as the punishment of offenses against the United States therein is concerned; the intent and meaning of this provision being that *the State wherein any such national forest is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State."* (Emphasis supplied.)

It thus clearly appears that when Oklahoma became a state, it was not the intention of either the Federal Government to deprive Oklahoma of jurisdiction over this area or the State of Oklahoma to deny itself jurisdiction therein in either civil or criminal matters, or to deny the inhabitants thereof of their rights and privileges as citizens of Oklahoma, or to absolve them from their duties as citizens of the state. It appears it was the intention of the United States to assert less than exclusive jurisdiction over the area in question. In Collins v. Yosemite Park & Curry Co., supra, 304 U.S. at page 530, 58 S.Ct. at page 1014, 82 L.Ed. 1502, it was said:

"As the national government may, 'by virtue of its sovereignty' acquire lands within the borders of states by eminent domain and without their consent, (James v. Dravo Contracting Co., 302 U.S. 134, 147, 155, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318) the respective sovereignties should be in a position to adjust their jurisdiction. There is no constitutional objection to such an adjustment of rights. It follows that jurisdiction less than exclusive may be granted the United States."

In light of the last quoted statute and this decision, it is apparent the United States Government can and did acquire less than exclusive jurisdiction over the lands herein

involved. Therefore, the foregoing state and Federal statutes clearly indicate an intention that Oklahoma was to retain not less than concurrent jurisdiction over lands acquired by the United States for forest and game reserve purposes.

The duty of the state to protect the public peace within the wildlife refuge is as much within its powers as is its duty to protect the life and property of its citizens in other areas of the state. The state's right of protection in either instance would not interfere with the Federal Government's use, disposition of, or control of its lands within the state set aside as a game reserve.

"A typical illustration is found in the usual Indian reservation set apart within a state as a place where the United States may care for its Indian wards and lead them into habits and ways of civilized life. Such reservations are part of the state within which they lie, and her laws, civil and criminal, have the same force therein as elsewhere within her limits, save that they can have only restricted application to the Indian wards. * * * Another illustration is found in two classes of military reservations within a state—one where the reservation, although established before the state is admitted into the Union, is not excepted from her jurisdiction at the time of her admission; * * *. In either case, unless there be a later and affirmative cession of jurisdiction by the state, the reservation is a part of her territory and within the field of operation of her laws, save that they can have no operation which would impair the effective use of the reservation for the purposes for which it is maintained."

Surplus Trading Co. v. Cook, 281 U.S. 647, 651, 50 S.Ct. 455, 456, 74 L.Ed. 1091. By analogy, the laws of Oklahoma would be applicable in the area in question, limited only as not to embarrass the United States in its use of the area as a game reserve. Hence:

"* * * for many purposes a state has civil and criminal jurisdiction over lands within its limits belonging to the United States, but this jurisdiction does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use, and to prescribe in what manner others may require rights in them. Thus, while the state may punish public offenses, such as murder or larceny, committed on such lands, and may tax private property, such as live stock, located thereon, it may not tax the lands themselves, or invest others with any right whatever in them."

Utah Power & Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 389, 61 L.Ed. 791. Such was the jurisdictional status of these lands when Oklahoma became a state. These conclusions are confirmed by the fact the United States does not now assert by statute anything more than proprietary control through the Secretary of Agriculture over said refuge. 16 U.S.C.A. § 686 provides that provisions of 16 U.S.C.A. § 684, supra, and § 685 are designed to prevent trespass on refuge lands but are not intended to interfere with the operation of local game laws. Thus, § 686 itself constitutes a recognition of the jurisdiction of the state over violations of its game laws within the area. Although the United States by this Act asserted its right to regulate matters of Federal concern relative to wildlife therein, it did not intimate that all other state laws of local concern could not be enforced in the area. The intimation is clearly to the contrary. The Federal Government has never sought to exercise any control over this area, other than such as is consistent with the effective use of the property for the purpose intended, a game reserve, as is clearly expressed by both reservation and conduct. 91 C.J.S. United States § 71, p. 141; 73 C.J.S. Public Lands § 3, p. 649. In this connection, it is pertinent that the United States has not seen fit to prescribe a developed legal system of its own for the

government of this refuge. In the absence thereof, Oklahoma has jurisdiction to enforce its local laws therein. Omaechevarria v. State of Idaho, 246 U.S. 343, 353, 38 S.Ct. 323, 325, 62 L.Ed. 763, holds:

"The police power of a state extends over the federal public domain, at least when there is no legislation by Congress on the subject."

This conclusion is in harmony with the observation:

"It is not unusual for the United States to own within a state lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the state. On the contrary, the lands remain part of her territory and within the operation of her laws save that the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal."

Surplus Trading Co. v. Cook, supra; James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318. Moreover, it is also in harmony with the observation:

"* * * no area however small (or large) will be left without a developed legal system for private rights."

James Stewart & Co. v. Sadrakula, 309 U.S. 94, 60 S.Ct. 431, 434, 84 L.Ed. 596, 127 A.L.R. 821, and the protection of the inhabitants thereof in their enjoyment of said rights. It has been held that ceding statutes should not be so construed as to make a no-man's land within the boundaries of a state. Valley County v. Thomas, supra. Such would be the case if Oklahoma police regulations were unenforceable within this area. But, it has been expressly held under such conditions, state police regulations are applicable. In McKelvey v. United States, 260 U.S. 353, 359, 43 S. Ct. 132, 135, 67 L.Ed. 301, it is said:

"It is also settled that the states may prescribe police regulations applicable to public land areas, so long as the regulations are not arbitrary or inconsistent with applicable congressional enactments. Among the regulations to which the state power extends are quarantine rules and measures to prevent breaches of the peace and unseemly clashes between persons privileged to go upon or use such areas."

■ We can reach no other conclusion than the United States did not reserve and the State of Oklahoma did not cede exclusive jurisdiction to the United States Government in this area when Oklahoma became a state and neither has since entered into any agreement to the contrary. The area is without protection as to breaches of the peace and unseemly clashes between individuals permitted to go thereon in use of said area, unless Oklahoma is permitted to exercise the residuum of jurisdiction it retains over the area, not in conflict with the authority vested in the Secretary of Agriculture to punish violations of the wildlife regulations prescribed by him. We are of the opinion that Oklahoma has jurisdiction to punish the violation herein charged.

In James Stewart & Co. v. Sadrakula, supra, reference is made to certain Congressional acts adopting the state statutes as a means of promoting uniformity in law enforcement affecting such areas as the refuge herein, but these acts were repealed by Act of Congress, Public Laws, Vol. 62, Ch. 645, Sec. 21, June 25, 1948.

The reserved question is resolved in favor of the State of Oklahoma and against the defendants, and the prosecution should proceed.

POWELL and NIX, JJ., concur.